## White *et al. versus* Welsh *et al.*

*Right of Vendor to retain Goods on Insolvency of Vendee.—Effect of on Contract.—Delivery, actual and constructive.—Stoppage in Transitu.—Right of Possession by Vendee, under Contract for Sale.— Custom of Merchants.— Charge for Storage what evidence of.—Insurance, effect of on Delivery.—Delivery of Samples, effect of.*

1. A vendor of goods, so long as they are in his possession, or in the custody of his agents, and while they are in transit from him to the vendee, has the right to refuse or countermand the final delivery, if the vendee be in failing circumstances.

2. The rejection of evidence as to constructive delivery and the contract of sale, is unimportant where the goods retained had not been removed after the sale, but continued in the stores and custody of the vendor, until, the insolvency of the vendees. On their failure the vendors had the right of retention for unpaid purchase-money, where no rights of third persons had intervened.

CERTIFICATE from Nisi Prius.

This was an action of trover brought February 10th 1858, by Henry White and James Stevens, trading as White, Stevens & Co., to the use of Isaac S. Waterman, their assignee, for the benefit of creditors, against Samuel Welsh, William Welsh, and John Welsh, trading as S. & W. Welsh, for the conversion of two hundred and thirteen hogsheads, twenty-five tierces, and two barrels of Cuba sugars.

The facts of the case are as follows :—

On the 1st of April 1857, Messrs. Aviles and Le Blanc chartered a vessel named D. G. Wilson, for a voyage from Baltimore to Cienfuegos, to bring a cargo back to Baltimore, or Philadelphia, or New York, or Boston. On the 10th of June 1857, a cargo of sugar was shipped on this vessel at Cienfuegos, consigned to the firm of Samuel & William Welsh, commission merchants, in Philadelphia. The cargo arrived safely in Philadelphia; passed through the custom-house; was weighed, and the weight marked upon each hogshead, tierce, and barrel. For some purpose, the casks were also marked, before their shipment, with certain marks, by which they could be identified, as " Concepcion," " Sabina," &c. After they had been weighed by the custom-house officers, they were housed in the stores of the defendants—a part in one store, and a part in others. Some of the brands or marks were placed by themselves in one room, and in one or more of the stores the brands were mixed.

The defendants thus having received and stored the property, sold to Garrett & Martin ten hogsheads, and to Brock, Emery & Co. ten hogsheads; and on the 11th of July 1857, Messrs. Field & Keehmle, merchandise brokers, acting under the orders of the

defendants, contracted to sell the entire cargo (two hundred and ninety-five hogsheads, thirty-six tierces, five barrels) to the plaintiffs, at the custom-house weight, at the rate of ten cents per pound, one per cent. off, the purchaser to have four months' credit from July 15th, and have the remainder of the months' storage and insurance; that is, they would be allowed to leave the sugars remain in the stores of the defendants, without charge, until August 9th, the expiration of the month from the day when they were taken into the stores; and they were also to have the benefit of the insurance which covered them during that month. They were also to have the benefit of the sales which the defendants had made of the twenty hogsheads to Garrett & Martin, and to Brock, Emery & Co., which had been made at a higher price.

This transaction took place not at the store of the defendants, where the sugars were, but at the place of business of the merchandise brokers, and the sale was made by sample.

A note of the sale—what is called a bought note—describing it and its terms, was sent to the defendants and entered upon their books; and on the same day, July 11th, a bill of parcels was made out by them for White, Stevens & Co., in which they are charged with all the sugar, amounting to 454,378 pounds, and credited it with the one per cent. discount, and with the proceeds of the sales to Garrett & Martin, and Brock, Emory & Co., as stipulated in the contract of sale, and showing the balance due to be $41,831.36.

On the 29th day of July 1857, the plaintiffs gave to the defendants their nine promissory notes for the purchase-money, dating them so that they might fall due at an average time of four months from July 15, according to the terms of the contract of sale. For these notes the defendants gave their receipts, stating therein that, when paid, they would be in full for bill which had been rendered on the 11th of the same month. At the same time, Mr. White, one of the plaintiffs, asked that the sugars might be insured under the defendants' policies, after the expiration of the month then current; and in compliance with his request, the insurances then effected were suffered to remain without reduction.

These sugars still continued in the stores of the defendants. Those sold to Garrett & Martin, and Brock, Emery & Co., were, however, delivered; and, under orders from Field & Keehmle, who became the brokers of the plaintiffs, after the sale to them, forty-two hogsheads and two tierces were delivered August 26th and August 28th, to White, Hart & Co., who bought from the plaintiffs. Under the same orders, on the 7th of September, twenty hogsheads and eleven tierces were delivered to Andrews & Morris, who were acting for White, Stevens & Co.

[White *et al. v.* Welsh *et al.*]

With the exception of the sugars that had been removed as above stated, they all remained in the stores of S. & W. Welsh until the 14th and 23d of November, when they were sold and delivered to Newhall & Co., at the price of seven cents per pound.

White, Stevens & Co. suspended on the 30th of September 1857. A meeting of their creditors was held on the 12th of October 1857. Mr. John Welsh, one of the firm of S. & W. Welsh, was present. A statement of the affairs of White, Stevens & Co. was laid before the meeting. A committee, consisting of William Welsh, one of the defendants, E. H. Fitler, and Samuel Grant, were appointed to investigate the affairs of the firm, and report to a future meeting.

The statement showed sugar debit $63,500. This item was the statement of the sugars they had on hand, and which were assets for the payment of debts. It was testified, that Mr. Stevens had stated at that meeting, loud enough to have been heard by Mr. John Welsh, "that they had a lot of sugars at Mr. Welsh's." The statement showed the debts due, including the notes hereinbefore mentioned, and the assets on hand, including the sugars in question, and no objection was made by Mr. John Welsh at that time to the statement. He did not, in any manner, claim to hold the sugars, or to have any lien upon them, nor say anything concerning them.

Another meeting of the creditors was held on the 3d of November 1857, and then Mr. William Welsh stated that defendants intended to hold the sugars which remained in their warehouse as security for their remaining unpaid notes. On the same day, November 3d, defendants wrote to White, Stevens & Co., notifying them that they would retain the balance of the sugars, per "D. G. Wilson," as security for the five notes still held by them, amounting to $23,239.64. On the 11th of November 1857, White, Stevens & Co. made an assignment to Isaac S. Waterman of all their estate and effects, in trust, for the benefit of their creditors. On the 3d of December 1857, Isaac S. Waterman demanded the sugars of the defendants, making the tender of all charges thereon. To this demand defendants answered by referring Mr. Waterman to their note to White, Stevens & Co., of November 3d.

This suit was then brought in the name of White, Stevens & Co., to the use of Isaac S. Waterman, assignee, as hereinbefore stated, to recover damages for the conversion of the sugars in question. The declaration was filed February 17th 1858, and defendants filed their plea of "not guilty" on the same day. The case was tried before his Honour, Judge STRONG, at Nisi Prius.

On the trial, several exceptions were taken to the rejection and admission of evidence, all of which are set out at length in the annexed specifications of error.

[White *et al. v.* Welsh *et al.*]

The learned judge before whom the case was tried, charged the jury as follows :—

"This case is important, not only on account of the amount in controversy between the parties, but also on account of the principles involved in it, and which must govern its determination. What those principles are, it is my duty to explain to you, and assist you, so far as I can, in applying them to the facts which are in evidence.

"In order to enable the plaintiffs to maintain their action, it is necessary for you to find that three things have been proved.

"1. That the plaintiffs were the owners of the sugar, that is, that the property in the sugar was theirs.

"2. That the plaintiffs had a right to the possession of the property when the alleged conversion took place.

"3. That the defendants converted the property to their own use.

"Each of these things is essential to the maintenance of the action; and to each, so far as may be necessary, I will direct your attention, as well as to the evidence which bears upon it, and by which the fact is attempted to be proved. Before doing so, however, it may be well, perhaps, to call your attention to the history of the case."

[Here his Honour stated the facts of the case briefly, and then continued :]

"Let me turn your attention now to the first of the three facts which I have already said are necessary to be proved in order to enable the plaintiffs to maintain this action. Is it proved that the property, the ownership of the sugars, became vested in White, Stevens & Co. ? You will observe that at the time when the plaintiffs gave their promissory notes, and the defendants received them, if not before, the sellers had done all that the contract of sale required them to do, in order to perfect it. Nothing remained to be done to ascertain the quantity, the quality, or the price of the goods, or to designate the subject-matter, the sale, or the particular articles sold. If the sale had been of a part of a larger quantity, as, for example, fifty hogsheads out of a hundred, or a hundred and ninety-five hogsheads, without describing what particular hogsheads, or anything had remained to be done to ascertain either the quantity or the price, the sale would have remained incomplete, and the ownership of the goods would not have passed to the buyers. But the price and quantity had been ascertained. The sugars had been weighed, and the agreement was to take them at that weight. The price had been defined, and notes were given and received for the amount. Nor was it a sale of part of a lot of goods. There was no uncertainty respecting the precise thing bought and sold. The particular goods were specified. They were the cargo of the

D. G. Wilson, and the hogsheads, tierces, and barrels were marked and indentified in the contract by those marks.

" The law is that when a bargain is struck, the terms of sale agreed upon, the property specified, and everything which the seller has to do with the goods is complete, the contract of sale becomes absolute without delivery, and the property vests in the buyer.

" I am of opinion, therefore, gentlemen, that the title to the property passed to White, Stevens & Co., under the contract of sale proved, and that delivery was not necessary to complete their ownership.

" But it is not only necessary for the plaintiffs to make out that they became the owners of the goods by the contract of sale, but it must also be proved that they had a right to the possession at the time when the alleged conversion took place.

" Ordinarily, the ownership of personal property carries with it the right of possession, but it is not always so. Familiar illustrations of this abound; thus, a man may rent his household furniture to another. He is still the owner, but the tenant has the right of possession even against him. So if a man leaves his carriage with a carriage-maker, to be repaired, and the work is done, the carriage-maker has the right to hold possession until he is paid for his work.

" So if goods are sold for cash, or sold and nothing is said as to the time of delivery or payment, it is a cash sale. If the goods are specified, the quantity and price fixed, the title passes, the buyer becomes the owner; he has the right of property. If they are consumed by fire it is his loss, but he has no right to the possession. He cannot take the goods until he pays the price.

" But if goods are sold on credit, and nothing is agreed upon as to the time of obtaining possession, the buyer is generally entitled to immediate possession. Then he has in most cases both the right of property and the right of possession. Yet his right to the possession is not indefeasible. If he becomes insolvent before he obtains possession, his right to it is gone. The seller may then refuse to deliver to him the goods, and may hold on to them until the price is paid, until the whole debt is paid. I repeat, gentlemen, for this is an important principle, and has a material bearing upon this part of the case : If goods are sold on credit, but the purchaser suffer them to remain in possession of the seller, until the term of credit has expired, or until the purchaser becomes insolvent, the seller's right to hold possession revives, and the buyer cannot claim to take the goods from him without first paying the price. This right of the seller grows out of his former ownership, and is allowed by the law on account of its obvious justice. When a buyer becomes insolvent before obtaining possession of property purchased, it is manifestly

[White *et al. v.* Welsh *et al.*]

inequitable that the seller's goods should be applied to the payment of the general creditors of the purchaser, and the seller be left unpaid. Accordingly, while the possession remains with the seller, he is not bound to give the goods up after the buyer has failed. This right of the seller is so favoured by the law, that even if he has parted with the possession, and delivered the goods to a carrier to be transmitted to the buyer, he may still stop them on their way and resume possession, if the buyer becomes insolvent before they reach their place of destination. There is at least equal reason for allowing him to hold on to the goods when he has never parted with their custody, or with the control over them. Yet if the goods have been delivered, if the seller has parted with the possession, and the buyer has obtained. it, and then became insolvent, there is no right in the seller to take back the possession.

"Even if they subsequently come back to his custody, and under his control, his right to retain them is gone. There has been an interruption of his possession, which is fatal to his claim to hold the goods as security, merely on account of the insolvency of the purchaser.

"And, gentlemen, I hold, and so instruct you, that these principles are applicable to the present case. The defendants were. factors, and received these sugars to sell on commission. They paid the freight, the duties, drayage, cooperage, and other expenses, and charged to their consignors, storage, insurance, and expenses severally, as well as percentage for guarantee. In answer to the drafts of the consignors they remitted the net price of the goods, and when the plaintiffs became insolvent they had paid, as the account current given in evidence shows, more than the entire value of the cargo of the D. G. Wilson. Without entering into the reasons why I think so, I give you as the law, that having sold the sugars on the 11th of July, and taken the notes of White, Stevens & Co., payable in four months, when the purchasers became insolvent on the 30th of September, these. defendants had a right to retain all the goods which had not been delivered until they received the price unpaid.

"It therefore becomes very important to inquire whether there was such a delivery of those sugars which remained in the defendants' stores, as is sufficient to defeat their right to hold them, after White, Stevens & Co. became insolvent. That the hogsheads were not removed until after the 30th of September is not denied, but there might have been a delivery without a removal, a sufficient delivery to put an end to all right of the sellers to retain them, and the principal contest in this case has been, whether any of the facts proved would in law warrant you in coming to the conclusion that such a delivery took place.

"In determining this, it is not necessary to define sharply what

2 Wr.—26

[White *et al. v.* Welsh *et al.*]

delivery is. Generally it may be said to be a handing over of the possession, a parting with it by the seller, and a taking it by the buyer. It is not a handing over of the title or ownership, but of the present enjoyment. It is the giving up the control of the goods which takes away the right of the vendor to retain after the vendee becomes insolvent.

"Generally, whether a thing sold was delivered or not, is a question of fact for the jury to determine; but they must determine it according to the evidence, and according to the law. You would not be at liberty to find that an unexecuted intention to surrender the possession of the sugars was delivery, and if there be no legal evidence of delivery, none can be presumed. There is then nothing for the jury to pass upon.

"The evidence which in this case has been submitted, and relied upon, to prove such a delivery as takes away the legal right of the vendors to retain the sugar, is that which is supposed to arise from the contract itself; from the words of the policies of insurance; from the removal of part of the cargo on the orders of Field & Keehmle, in favour of purchasers of those parts from White, Stevens & Co., and from the taking of samples. I propose to call your attention to each of these, and inquire whether in law any one or all combined furnishes any evidence that the sugars remaining in the stores had been delivered before the 30th of September 1857—so delivered as to interrupt the defendants' possession, and destroy their right to retain.

"It is contended that the provision in the contract of sale,— 'remainder of month's storage and fire insurance to buyer,'— made the Messrs. Welsh the warehousemen of the plaintiffs, and therefore passed the possession to the plaintiffs. There is no evidence of any express arrangement between the parties respecting storage, other than that contained in the bought note. None whatever that they were or were not to pay storage after the expiration of the first month. It may be presumed that the Messrs. Welsh would have charged it, if the sugars had been taken away after the month, but there was no express contract to that effect. If there had been, and the agreement had gone farther and provided that, after the first month the Welshes should hold the goods as the warehousemen of the plaintiffs, then the possession of the Welshes under such an agreement would have been the possession of the plaintiffs, and there would have been evidence of a delivery. But there is no such proof, and the question therefore is, what was the effect of the provision in the contract as proved upon the goods in the store? It merely relieved the buyers from paying storage up to August 9th. Or, if it be considered that the storage was a part of the consideration of their purchase, and that they paid storage during the first month, it makes no difference in my judgment. If it was a

[White *et al. v.* Welsh *et al.*]

charge of storage, then it was for a time commencing before the plaintiffs had any right to the delivery of the goods, for their notes were not given until July 29th. It was, consequently, no acknowledgment of delivery. But, apart from this, the rule of law is that a mere charge of storage, even if it is paid, is no evidence that goods sold on credit, and remaining in the store of a vendor, have been delivered, so as to defeat his right to retain them, if the vendee becomes insolvent.

"I instruct you, therefore, gentlemen, that there is nothing in any contract which has been proved in this case to pay storage, or in the charge of storage, that tends to prove delivery, or that interferes with the right of the Messrs. Welsh to hold on to the goods sold, after the 30th September.

"Nor do I discover anything in the policies of insurance which have been given in evidence, which would justify you in finding that there had been any delivery of the sugars in the stores. Six have been given in evidence. Five of them were taken out before the month of July 1857. No words in them, therefore, could be evidence that a delivery had been made under a contract not in existence when they were written. The sixth was taken out in July, but it does not refer in terms to these goods, and it was written before White, Stevens & Co. were entitled to any possession of the sugars, before they had given their notes.

"Next, what is the legal effect of the delivery of the parcels sold to White, Hart & Co.?

"There is evidence that after the sale was made to the plaintiffs, and after they had given their notes, portions of the sugars were taken away from the defendants' stores, with their consent, under orders drawn by Field & Keehmle, and probably at the instance of White, Stevens & Co. Andrews & Morris obtained some, and White, Hart & Co., others. These removals were made on the 26th and 28th August, and on the 7th of September. After the plaintiffs had given their notes, undoubtedly the hogsheads and tierces thus taken away were delivered, and were no longer liable to be retained by the defendants, even if they had again come into their possession. But did the removal of these lots, with the consent of the defendants, constitute an absolute delivery of those which were not taken away, but which remained in the stores until after the failure of White, Stevens & Co.? For the contest here is in regard to the remaining sugars. The rule of law is, that a delivery of a portion of goods included in a contract of sale, is a delivery of the whole only when the delivery of such portion is in the name or place of the whole, and is intended to be a delivery of the whole. Therefore, the removal of the portions of these sugars which were taken from the warehouse of the defendants, by the directions of Field &

[White *et al. v.* Welsh *et al.*]

Keehmle, and. at the instance of the plaintiffs after the sale to them, was not of itself more than a delivery of the particular goods taken away. It did not necessarily disturb the possession of the sellers as to those not removed, or take away their right to hold on to them until the price was paid. To give to the delivery of the portions taken away such an effect, to make it a delivery of the whole, it is necessary that it should have been proved that they were delivered in the name of the whole, and with the intention that in giving up the possession of those hogsheads they were giving up the possession of the whole. Nor did the giving up a part to the purchasers of White, Stevens & Co. become a delivery of the remainder, because Messrs. Samuel & William Welsh did not avow or express an intention to retain the rest. Had the plaintiffs, after the sale to them, or had their agents sent an order to the defendants for the delivery of the whole cargo bought, or of all which remained undelivered, and had a portion of the goods been delivered under that order, a very different question would have been presented. There the delivery of the portion would have been in the name of the whole. But the orders here were entirely different. They were not orders for the whole. They were orders for portions. The deliveries were upon the orders, and were therefore deliveries of portions. In such a case, the law does not presume that the delivery of such portion is a delivery of the whole. You would not, therefore, be warranted by the facts that White, Stevens & Co. sold parcels of these sugars to White, Hart & Co. and to Andrews & Morris, and that these purchasers removed the parcels sold to them from the defendants' warehouse, before the insolvency of the plaintiffs—I say that you would not be warranted in finding that the remainder of the sugars not removed were delivered, so as to bar the defendants' right to retain them until the price was paid.

"It is next contended on the part of the plaintiffs, that the delivery of the samples furnished to Field & Keehmle, by which they made the sale to the plaintiffs on the 11th of July 1857, constituted a delivery of the whole lot purchased. I do not think so. Even if the samples which Field & Keehmle first had, were at the sale placed in the possession of White, Stevens & Co:, it was not for the purpose of delivery. Field & Keehmle were mere merchandise brokers. Their power was to make the contract of sale for their principals. They had no power to deliver the goods. And, besides, at that time, the plaintiffs were not entitled to have delivery made. They had bought on credit; and, by the terms of sale, as evidenced in the bill of parcels delivered to them, they were to give their notes, at four months, before they would be entitled to the possession. These notes were not given until the 29th of July. Until that day, there-

fore, they had no right to the possession. The samples, if they obtained them at all, were obtained on the 11th of the month, eighteen days previous. They could, therefore, neither have been given nor received with the intention of delivering the goods bought.

"Again, it is contended, that the resampling of the goods by the sampler of Field & Keehmle, when they were acting as brokers of White, Stevens & Co., with the knowledge and consent of the defendants, constitutes a delivery, and that the defendants are estopped from denying it. This proposition assumes that the act of resampling by the agents of the plaintiffs, with the knowledge and consent of the defendants, has been proved. The only evidence on this subject is to be found in the testimony of Samuel Field. He testifies : ' We had occasion to send samples of these sugars to New York, in September, for White, Stevens & Co.; I can't say whether they were fresh samples, but my impression is that they were ·fresh; our sampler, I presume, took them; I can't say; I have no knowledge upon the subject.' Having no personal knowledge upon the subject, of course his testimony cannot prove that fresh samples were taken. But, even if they were, no delivery orders had been given, as had been for all the casks actually delivered and removed. And it does not appear that they were taken by plaintiffs' orders, nor is there anything to show that the act was intended to be a taking of the possession. Had the samples been taken by White, Stevens & Co., after they gave their notes for the purchase-money, or by any one authorized by them to receive delivery, a different question would have arisen.

"Taking samples under such circumstances, has been held to be evidence from which a jury might infer delivery. But the circumstances in this case are widely different. There is no proof that Field & Keehmle were authorized to receive delivery. They were the merchandise brokers of the plaintiffs, their agents to make contracts of sale, and then draw orders for the delivery to the purchasers. Their taking samples under these circumstances, is no evidence of a delivery of the goods to White, Stevens & Co., under the contract of sale to them.

"I do not deem it necessary to call your attention to the proof which has been submitted to show that possession never was delivered, such as the retention of the keys of the storehouses, the custody over them maintained by defendants' porter, &c. It is an uncontroverted fact that the sugars remained undisturbed in the defendants' stores and under the defendants' locks and keys, until after the insolvency of the plaintiffs. At any time before that the plaintiffs might have removed them, and the defendants could not have prevented it. But, when White, Stevens & Co. failed, the rights of the parties · became different.

[White *et al. v.* Welsh *et al.*]

Then, if the sugars had not been delivered before, if the plaintiffs had not taken possession, they no longer had a right to the possession until they paid the price, and the defendants could lawfully hold on to the goods.

" The burden of the proof, then, is upon the plaintiffs, to show that they had taken possession before the 30th of September, when they failed.

" After a careful examination of the evidence, gentlemen, I am unable to see that such proof has been given, or that there is any evidence from which it can be inferred.

" The plaintiffs, then, have failed in making out the second fact, which, as I have told you, is necessary in order to enable them to maintain this action. I mean that they have not proved that they had a right of possession at the time when the conversion is alleged to have taken place.

" I am asked, however, to instruct you that the defendants could not exercise the right of sellers to retain the goods sold to White, Stevens & Co., for their price, without having the promissory notes, received in settlement for the same, ready to return to the makers from the time of their insolvency. I decline so instructing you. The insolvency of the buyer, and the retention of the goods, are not a rescission of the contract of sale.

" Nor does the fact that the defendants parted with some of the notes of the buyers, without recourse to themselves, stand at all in the way of their exercising their right to retain the sugars until all the notes which they still held are paid. The vendees, after their insolvency, were not entitled to the possession until they paid the whole price.

" Nor, gentlemen, is there anything in the case to prove that the defendants did anything after the plaintiffs became insolvent, either to estop themselves from asserting their right to retain, or to waive any right which they then had. Neither the silence of Mr. John Welsh at the first meeting of the creditors, nor the action of Mr. William Welsh upon the committee, nor their letter of the 2d of November 1857, claiming to hold the goods as security, nor their subsequent sale of the sugars to Mr. Newhall, can be construed as a waiver or estoppel, and there is no evidence of a waiver or estoppel.

" It follows that we have nothing to do with the sale of the sugars to Newhall on the 14th of November. If the defendants then transcended their rights, it may be determined in another action, if any one has been injured. The only question which is material now is, whether they had a right to retain the possession of the sugars which remained in their stores, after the plaintiffs became insolvent; and I am of opinion that they had, consequently that the plaintiffs had no longer a right to the possession.

[White *et al. v.* Welsh *et al.*]

" This view of the case, which I feel bound to take, renders it unnecessary for me to direct your attention to the proof of conversion which has been given. Were it necessary to pass upon that, there is evidence of a conversion before the plaintiffs' assignment to Waterman, in regard to which you would probably have but little difficulty. But no conversion is alleged to have been made before the plaintiffs became insolvent, and after that time they had no right to the possession.

" Upon the law, then, gentlemen, your verdict must go for the defendants."

Under this charge, which was also excepted to, there was a verdict and judgment in favour of defendants. Whereupon, at the instance of plaintiffs, the case was certified to the Supreme Court in banc, where the following matters were assigned for error:—

1. The learned judge who tried the cause erred in refusing to permit plaintiffs' counsel to show by William C. Keehmle, a witness examined on their behalf, that by the established usage among the mercantile men of Philadelphia, the custom is that if goods are stored in a warehouse (in all cases in which storage or warehouse rent is or can be charged), the owner of the warehouse is entitled to a full month's storage or warehouse rent for the first month, and if the goods remain for more than a month, then the charge is for half a month, and so on, from half-month to half-month, for so long as they remain; and that this is so, although the goods may be removed even within a day or a week after the beginning of any month or half-month.

2. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to show, by said William C. Keehmle, that by the certain, uniform, and notorious custom of the sugar trade in Philadelphia, it was implied that the buyer should have the benefit of the current month's storage; and that, where it was so agreed, it was also implied that after the current month's storage had expired, the buyer was bound for the storage for such a length of time as the goods remained in the said warehouse or store.

3. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to show, by L. C. Madeira, a witness produced on their behalf, what was the meaning of the words written in pencil at the foot of the bill of parcels, which had already been given in evidence to the jury, which words are as follows:—

" Storage expires August 9th.
    Insurance  "      October 9th."

4. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to show, by the witness L. C. Ma-

[White *et al. v.* Welsh *et al.*]

deira, what—according to the usage and custom prevailing among the mercantile men of Philadelphia, and especially those engaged in the sugar trade, certain, uniform, and notorious—was the meaning of the words written in pencil at the foot of the bill of parcels, which had already been given in evidence to the jury, which words are as follows:—

"Storage expires August 9th.
Insurance " October 9th."

5. The learned judge who tried the cause also erred in refusing to permit plaintiffs' counsel to ask L. C. Madeira whether the defendants did not sometimes sell to persons not considered good, and, by an arrangement in such cases, retain the goods sold as collateral security?—to be followed by the question, whether he had not charge of such goods, and whether there was any such arrangement made in this case?

6. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to ask the witness L. C. Madeira, if, from the nature of his employment with the defendants, he would not have had the care or charge of all goods held in pledge, or as security, by the defendants.

7. The learned judge who tried the cause also erred in refusing to permit the plaintiffs' counsel to show, by the witness L. C. Madeira, that, from the nature of his employment with the defendants, he had cognisance of all goods held in pledge by the defendants, and that the sugars in question were not so held.

8. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to show, by the witness L. C. Madeira, that at any time after the 29th of July 1857, and before the failure of White, Stevens & Co., the defendants would have permitted the sugars in question to have been removed by White, Stevens & Co., without objection, and that his knowledge on this subject is founded on his position in the house of the defendants, and his connection with this part of their business.

9. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to show, by Wade H. Morris, witness produced by plaintiffs, that, under the instructions of White, Stevens & Co., the firm of Andrews & Morris, merchandise brokers in the city of Philadelphia, did, in the month of September 1857, obtain from the warehouse of defendants, twenty hogsheads of this sugar, as a sample of those remaining on hand of the cargo of the "D. G. Wilson," and sent them to Baltimore, and offered the remainder of the cargo for sale in Baltimore, by these samples; the learned judge having ruled out all that part of the offer relating to the sending them to Baltimore, and offering the remainder of the cargo for sale in Baltimore by these samples.

[White *et al. v.* Welsh *et al.*]

10. The learned judge who tried the cause erred in permitting six policies of insurance,—to wit, one of the Royal Insurance Company for $20,000, dated 2d day of July 1855; one of the same company for $10,000, dated 18th day of July 1857; one of the Delaware Mutual Insurance Company for $16,000, dated the 18th day of July 1857; one of the Fire Insurance Company for $10,000, dated the 20th day of June 1857; one of the North American Insurance Company for $20,000, dated 27th day of May 1849; one of the Western Insurance Company for $10,000, dated the 18th day of July 1857—to be given in evidence by the defendants, as covering these sugars after the 29th of July 1857, notwithstanding they were objected to by plaintiffs' counsel.

11. The learned judge who tried the cause erred in that, after having permitted the said six policies of insurance to be given in evidence by the defendants, he refused to permit the plaintiffs' counsel to show, by L. C. Madeira (the witness who had charge of the insurance business of the defendants, and had noted the arrangement with White, Stevens & Co., to have the sugars in question covered by the policies of the defendants, and had examined the policies of the defendants to see that there was insurance enough to cover these sugars), under what clauses of the policies in evidence the sugars in question were covered or embraced.

12. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to show, by the witness L. C. Madeira, that the terms of only a portion of the policies given in evidence included the sugars in question.

13. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to show that the policy of the Western Insurance Company does not by its terms embrace the sugars in question.

14. The learned judge who tried the cause erred in refusing to permit the plaintiffs' counsel to show, by the witness L. C. Madeira, that, by the established usage and custom of the sugar trade of Philadelphia, the words used in the policy of the Western Insurance Company, "goods sold but not delivered," did not embrace the sugars in question.

15. The learned judge who tried the cause also erred in refusing to permit the plaintiffs' counsel to show, by the witness L. C. Madeira, that, according to the well-understood meaning of the words "goods sold but not delivered," used in the policy of the said Western Insurance Company, as the same are used among the mercantile men of Philadelphia and those engaged in the insurance business, the words "goods sold but not delivered," as used in the said policy, did not include the sugars in question.

16. The learned judge who tried the cause erred in refusing

[White *et al. v.* Welsh *et al.*]

to permit the plaintiffs' counsel to show, by the witness L. C. Madeira, that, according to the usage prevailing among the mercantile men of Philadelphia, and those engaged in the insurance business, certain, uniform, and notorious, the sugars in question were not embraced or included by the words used in the policy of the Western Insurance Company, " goods sold but not delivered," but that they are embraced and included in the words of the other policies of insurance given in evidence,—viz., " goods sold but not removed."

17. The learned judge who tried the cause erred in charging the jury as follows :—

"The defendants were factors, and received these sugars to sell on commission.   They paid the freight, the duties, drayage, cooperage, and other expenses, and charged to their consignors storage, insurance, and expenses generally, as well as a percentage for guarantee.   In answer to the drafts of the consignors, they remitted the net price of the goods, and when the plaintiffs became insolvent they had paid, as the account current given in evidence shows, more than the entire value of the cargo of the D. G. Wilson.   Without entering into the reasons why I think so, I give to you as the law that, having sold the sugars on the 11th of July, and taken the notes of White, Stevens & Co., payable in four months, when the purchasers became insolvent on the 30th of September, these defendants had a right to retain all the goods which had not been delivered, until they received the price unpaid."

18. The learned judge who tried the cause erred in charging the jury as follows :—

"It is contended that the provision in the contract of sale, 'remainder of month's storage, and fire insurance to buyer,' made the Messrs. Welsh the warehousemen of the plaintiffs, and therefore passed the possession to the plaintiffs.   There is no evidence of any express arrangement between the parties respecting storage, other than that contained in the bought note.   None whatever that they were or were not to pay storage after the expiration of the first month.   It may be presumed that the Messrs. Welsh would have charged it if the sugars had been taken after the month, but there was no express contract to that effect.

19. The learned judge who tried the cause erred in charging the jury as follows :—

" If there had been, and the agreement had gone further, and provided that after the first month the Welshes should hold the goods as the warehousemen of the plaintiffs, then the possession of the Welshes under such an agreement, would have been the possession of the plaintiffs, and there would have been evidence of delivery.   But there is no such proof; and the question

[White *et al. v.* Welsh *et al.*]

therefore is, what was the effect of the provision in the contract as proved upon the goods in the store? It merely relieved the buyers from paying storage up to August 9th. Or if it be considered that the storage was a part of the consideration of their purchase, and that they paid storage during the first month, it makes no difference, in my judgment. If it was a charge of storage, then it was for a time commencing before the plaintiffs had any right to the delivery of the goods, for their notes were not given until July 29th. It was, consequently, no acknowledgment of delivery. But, apart from this, the rule of law is that a mere charge of storage, even if it is paid, is no evidence that goods sold on credit, and remaining in the store of the vendor, have been delivered, so as to defeat his right to retain them if the vendee become insolvent.

"I instruct you, therefore, gentlemen, that there is nothing in any contract which has been proved in this case to pay storage, or in the charge of storage, that tends to prove delivery, or that interferes with the right of Messrs. Welsh to hold on to the goods sold after the 30th September."

20. The learned judge who tried the cause erred in charging the jury as follows:—

"Nor do I discover anything in the policies of insurance which have been given in evidence, which would justify you in finding that there had been any delivery of the sugars in the stores. Six have been given in evidence. Five of them were taken out before the month of July 1857. No words in them, therefore, could be evidence that a delivery had been made under a contract not in existence when they were written. The sixth was taken out in July, but it does not refer in terms to these goods, and it was written before White, Stevens & Co. were entitled to any possession of the sugars, before they had given their notes."

21. The learned judge who tried the cause erred in charging the jury as follows:—

"Next, what is the legal effect of the delivery of the parcels sold to White, Hart & Co.?

"There is evidence that after the sale was made to the plaintiffs, and after they had given their notes, portions of the sugars were taken away from the defendants' stores with their consent, under orders drawn by Field & Keehmle, and probably at the instance of White, Stevens & Co. Andrews & Morris obtained some, and White, Hart & Co., others. These removals were made on the 26th and 28th August, and on the 7th of November. After the plaintiffs had given their notes, undoubtedly the hogsheads and tierces thus taken away were delivered, and were no longer liable to be retained by the defendants, even if they had again come into their possession. But did the removal of these

[White *et al. v.* Welsh *et al.*]

lots, with the consent of the defendants, constitute an absolute delivery of those which were not taken away, but which remained in the stores until after the failure of White, Stevens & Co.? For the contest here is in regard to the remaining sugars. The rule of law is, that a delivery of a portion of goods sold is a delivery of the whole, only when the delivery of such portion is in the name and place of the whole, and is intended to be a delivery of the whole. Therefore the removal of the portions of these sugars which were taken from the warehouse of the defendants, by the direction of Field & Keehmle, and at the instance of the plaintiffs, after the sale to them, was not of itself more than a delivery of the particular goods taken away. It did not necessarily disturb the possession of the sellers as to those not removed, or take away their right to hold on to them until the price was paid. To give to the delivery of the portion taken away such an effect,—to make it a delivery of the whole, —it is necessary that it should have been proved that they were delivered in the name of the whole, and with the intention that in giving up the possession of these hogsheads they were giving up the possession of the whole. Nor did the giving up a part to the purchasers of White, Stevens & Co., become a delivery of the remainder, because Messrs. Samuel & William Welsh did not avow or express an intention to retain the rest. Had the plaintiffs, after the sale to them, or had their agents sent an order to the defendants for the delivery of the whole cargo bought, or of all which remained undelivered, and had a portion of the goods been delivered under that order, a very different question would have been presented. There the delivery of the portion would have been in the name of the whole. But the orders have been entirely different. They were not orders for the whole. They were orders for portions. The deliveries were made upon the orders, and were therefore deliveries of portions. In such a case the law does not presume that the delivery of such portion is a delivery of the whole. You would not, therefore, be warranted by the facts that White, Stevens & Co. sold parcels of these sugars to White, Hart & Co., and to Andrews & Morris, and that these purchasers removed the parcels sold to them from the defendants' warehouse, before the insolvency of the plaintiffs—I say that you would not be warranted in finding that the remainder of the sugars not removed were delivered, so as to bar the defendants' right to retain them until the price was paid."

22. The learned judge who tried the cause erred in charging the jury as follows :—

"It is next contended on the part of the plaintiffs that the delivery of samples, furnished to Field & Keehmle, by which they made the sale to the plaintiffs on the 11th of July 1857, constituted a

delivery of the whole lot purchased. I do not think so. Even if the samples which Field & Keehmle first had were at the sale placed in the possession of White, Stevens & Co., it was not for the purpose of delivery. Field & Keehmle were mere merchandise brokers. Their power was to make the contract of sale for their principals. They had no power to deliver the goods. And besides, at that time the plaintiffs were not entitled to have delivery made. They had bought on credit, and, by the terms of sale, as evidenced in the bill of parcels delivered to them, they were to give their notes, at four months, before they would be entitled to the possession. These notes were not given until the 29th of July. Until that day, therefore, they had no right to the possession. The samples, if they obtained them at all, were obtained on the 11th of the month, eighteen days previous. They could, therefore, neither have been given nor received with the intention of delivering the goods bought."

23. The learned judge who tried the cause erred in charging the jury as follows:—

"Again, it is contended that the resampling of the goods by the sampler of Field & Keehmle, when they were acting as brokers of White, Stevens & Co., with the knowledge and consent of the defendants, constitutes a delivery, and that the defendants are estopped from denying it. This proposition assumes that the act of resampling by the agents of the plaintiffs, with the knowledge and consent of the defendants, has been proved. The only evidence on this subject is to be found in the testimony of Samuel Field. He testifies: 'We had occasion to send samples of these sugars to New York, in September, for White, Stevens & Co.; I don't say whether they were fresh samples, but my impression is that they were fresh; our sampler, I presume, took them; I can't say; I have no knowledge upon the subject.' Having no personal knowledge upon the subject, of course his testimony cannot prove that fresh samples were taken. But even if they were, no delivery orders had been given, as had been for all the casks actually delivered and removed. And it does not appear that they were taken by plaintiffs' orders; nor is there anything to show that the act was intended to be a taking of the possession. Had the samples been taken by White, Stevens & Co., after they gave their notes for the purchase-money, or by any one authorized by them to receive delivery, a different question would have arisen.

"Taking samples under such circumstances, has been held to be evidence from which a jury might infer a delivery. But the circumstances in this case are widely different. There is no proof that Field & Keehmle were authorized to receive delivery. They were the merchandise brokers of the plaintiffs, their agents to make contracts of sale, and then draw orders for the delivery

[White *et al. v.* Welsh *et al.*]

to the purchasers. Their taking samples under these circumstances is no evidence of the delivery of the goods to White, Stevens & Co., under the contract of sale to them."

24. The learned judge who tried the cause erred in charging the jury as follows:—

"The burden of proof, then, is upon the plaintiffs, to show that they had taken possession before the 30th of September, when they failed.

"After a careful examination of the evidence, gentlemen, I am unable to see that such proof has been given, or that there is any evidence from which it can be inferred.

"The plaintiffs, then, have failed in making out the second fact, which, as I have told you, is necessary in order to enable them to maintain this action. I mean, that they have not proved that they had a right of possession at the time when the conversion is alleged to have taken place."

25. The learned judge who tried the cause erred in charging the jury as follows:—

"I am asked, however, to instruct you that the defendants could not exercise the right of sellers, to retain the goods sold to White, Stevens & Co., without having the promissory notes received in settlement for the same ready to return to the makers from the time of their insolvency. I decline so instructing you. The insolvency of the buyer and the retention of the goods are not a rescission of the contract of sale."

26. The learned judge who tried the cause erred in charging the jury as follows:—

"Nor does the fact that the defendants parted with some of the notes of the buyers, without recourse to themselves, stand at all in the way of their exercising their right to retain the sugars until all the notes which they still hold are paid. The vendees, after their insolvency, were not entitled to the possession until they paid the whole price."

27. The learned judge who tried the cause erred in charging the jury as follows:—

"Nor, gentlemen, is there anything in the case to prove that the defendants did anything after the plaintiffs became insolvent, either to estop themselves from asserting their right to retain, or to waive any right which they then had. Neither the silence of Mr. John Welsh at the first meeting of the creditors, nor the action of Mr. William Welsh upon the committee, nor their letter of the 2d of November 1857, claiming to hold the goods as security, nor their subsequent sale of the sugars to Mr. Newhall, can be construed as a waiver or estoppel, and there is no evidence of any waiver or estoppel."

28. The learned judge who tried the cause erred in charging the jury as follows:—

[White *et al. v.* Welsh *et al.*]

" It follows that we have nothing to do with the sale of the sugars to Newhall on the 14th of November. If the defendants then transcended their rights, it may be determined in another action, if any one has been injured. The only question which is material now, is whether they had a right to retain the possession of the sugars which remained in the stores after the plaintiffs became insolvent, and I am of opinion that they had; consequently, that the plaintiffs had no longer a right to the possession."

29. The learned judge who tried the cause erred in charging the jury as follows:—

"This view of the case, which I feel bound to take, renders it unnecessary for me to direct your attention to the proof of conversion which has been given. Were it necessary to pass upon that, there is evidence of a conversion before the plaintiffs' assignment to Waterman, in regard to which you would probably have but little difficulty. But no conversion is alleged to have been made before the plaintiffs became insolvent, and after that time they had no right to the possession.

"Under the law, then, gentlemen, your verdict must go for the defendants."

30. The thirtieth exception was to the charge as a whole.

*J. C. Bullitt, B. Gerhard,* and *Wm. C. Meredith,* for plaintiffs in error.—I. Considering the sale of the sugars in controversy to plaintiffs, and their conversion by defendants as undeniable and conceded, they argued that under the law and the facts of the case the defendants had surrendered, and the plaintiffs had taken the entire and unqualified control of it, on the 29th of July 1857, and that it was theirs by virtue of the then execution of the contract, and in pursuance of its terms; and that the constructive delivery which they contended was proved in this case, was as effectual as an actual delivery to defeat the vendor's right of retainer, though it might not bar the right to *stop in transitu.*

The facts on which they relied for proof of this were these:—

1. The sale of the sugars was made by sample, on credit, according to the Custom-house weights, with the benefit of the current month's storage, and insurance to White, Stevens & Co., and the defendants were warehousemen as to the sugars, for Aviles & Le Blanc, before the sale, and became such for White, Stevens & Co. after the sale.

2. The contract was fully complied with, and the consideration given as contracted for,—in other words, it was an executed contract.

3. The sugars were sold by agreed weights, to wit, the custom-house weights; they were distinctively marked; and they

were set apart, or separated from any other goods of defendants, so that no questions could arise as to the specific articles sold.

4. Defendants contracted with plaintiffs to keep the sugars on storage, for plaintiffs, free of charge, up to the 9th of August 1857, that being the end of the current month, and also to have them protected by defendants' policies of insurance to the same period; also by contracting to do the same thing after that period.

5. Plaintiffs exercised complete power over them, by taking samples in small quantities, and also by taking and removing, in one instance (September 7th 1857), 200 hhds. and 11 tierces, as samples by which to sell the whole cargo.

6. Plaintiffs sold and removed at one time (August 26th 1857) ten hogsheads (and at another (August 28th 1857) twenty-two hogsheads and three barrels, without objection or hindrance, and without any new contract, but in the exercise of their control and power under the contract of July 11th 1857.

7. Field & Keehmle, who had been the brokers of defendants, and sold the sugars to plaintiffs by samples, forthwith became the brokers of plaintiffs for the sale of the sugars, and did offer them for sale by the same and fresh samples as the property of plaintiffs, and the power and control of plaintiffs were recognised as perfect and absolute by the deliveries to them from the warehouse of defendants whenever demanded.

8. When the creditors of plaintiffs had met (one of defendants being present), these sugars were placed in the statement of their affairs as an asset without any remark or objection by the defendant then present.

9. The defendants, *quoad* these sugars, were in fact the warehousemen of Aviles & Le Blanc, and were paid by them for the month's storage, and that in selling for their principals they sold the storage with the sugars, and thus became warehousemen for plaintiffs.

The authorities on which they relied for this view of the case were Bolin *v.* Huffnagle, 1 Rawle 19; Ellis *v.* Hunt, 3 Term Rep. 464; Hammond *v.* Anderson, 4 Bos. & Pul. 69; Stoveld *v.* Hughs, 14 East 308; Philemore *v.* Barry, 1 Campb. 513; Greene *v.* Haythorne, 1 Stark. Rep. 363; Elmore *v.* Stone, 1 Taunt. 458; Hurry *v.* Mangles, 1 Campb. 452; which they argued were not overruled by Miles *v.* Garton, 2 C. & M. 504, or Townly *v.* Crump, 4 Ad. & El. 58. The former approves of and is consistent with Hurry *v.* Mangles, while Townly *v.* Crump is only as to the effect of a delivery order on the right to retain.

The American cases also sustain the position taken by plaintiffs: Chapman *v.* Searle, 3 Pickering 38; Heine *v.* Anderson, 2 Dud. R. 318; 10 Harris 460; Means *v.* Williamson, 37 Maine 556; Fraser *v.* Hilliard, 2 Strobh. 309; Barrett *v.* Goddard, 3

[White et al. v. Welsh et al.]

Sumner 107. If the fact of delivery was doubtful, it should have been submitted to the jury: Smyth v. Craig, 3 W. & S. 14.

II. The rejection of the testimony mentioned in the first, second, third, and fourth specifications of error as to custom and usage in such cases, was said to be error, on the authority of 1 Gr. Ev., §§ 292, 294; Syers v. Jonas, 2 Exch. Rep. 111; Lundy v. Reily, 30 Law Times Rep. 223; Lucas v. Bristow, 27 Law J. Q. B. 364 (N. S.); Humphrey v. Dale, Id. 390; Carter v. Crick, 28 Law J. Rep. Exch. 238 (N. S.); Lindsay v. Janson, 28 Id. 315; Watt v. Hoch, 1 Casey 411; Erisman v. Walters, 2 Id. 467.

III. The rejection of the evidence mentioned in the fifth, sixth, seventh, and eighth specifications was complained of, as it tended to prove that plaintiffs had such control over the sugars as to have removed them at their pleasure.

IV. The admission of the testimony relative to the insurance, as set out in the specifications 10, 11, 12, 13, 14, 15, 16, and 20, and which was offered by defendants to show that the policies covered the sugars in question, and that, as this was done with the consent of plaintiffs, it must be inferred that they agreed that its status was correctly described in the policies; was complained of, unless the plaintiffs were allowed to show the meaning of the words used therein according to usage and custom, which they were prevented from doing, contrary to the law as laid down in Keight v. Rhinelander, 1 Johns. 192; Coit v. Com. Ins. Co., 7 Id. 385; Scott v. Bourdillon, 5 B. & P. 213; Astor v. Union Ins. Co., 7 Cowen 202; Taylor v. Briggs, 2 C. & P. 528; Brough v. Whitmore, 4 T. Rep. 206; Eyre v. Mar. Insurance Co., 5 W. & S. 117.

As the question of delivery was one of intention, plaintiffs had a right to show that the words "sold but not removed from store" meant "goods sold and delivered;" and the rejection of this testimony and the witness by whom the business was transacted, was error.

V. As to the 17th specification, they argued that defendants never were owners, but merely consignees and warehousemen, and could therefore exercise no act of ownership.

VI. As to the contract for storage mentioned in the 18th and 19th specifications, they argued that it was evidence to show that defendants were the warehousemen of plaintiffs, which should have gone to the jury.

VII. As to the delivery of samples to Field & Keehmle, and the sales to White, Hart & Co. and Andrews & Morris, mentioned in the 21st and 22d specifications of error, they contended that the judge erred in deciding as to the effect of these acts, and in not submitting them to the jury as evidence of the control which

2 WR.—27

[White *et al. v.* Welsh *et al.*]

plaintiffs had over the sugars; for which they cited Foster *v.* Frampton, 6 B. & C. 107; Tanner *v.* Scovell, 14 M. & W. 28.

VIII. They also argued that there was error in the instruction to the jury as noted in specifications 21, 22, and 23, because, after the sale to White, Stevens & Co., they were represented by Field & Keehmle, through whom every delivery of the sugars sold by plaintiffs was made, which function they could not perform without a previous delivery to them by defendants.

IX. Under specifications 25 and 26, they argued that defendants could not exercise the right of retainer without having the unpaid notes in hand; citing Bunney *v.* Poyntz, 4 B. & A. 568.

*Fallon & Serrill,* and *George M. Wharton,* for defendants, argued—

1. Where goods are sold and nothing is said as to the time of delivery or payment, and everything the seller has to do with them is complete, the property vests in the buyer, so as to subject him to the risk of any accident which may happen to them, and the seller is liable to deliver, whenever they are demanded, *upon payment of the price:* but the buyer has no right to possession *till the price be paid.* This right to retain possession until payment, grows out of the original ownership and the equity founded upon it. If goods are sold *upon credit,* and nothing is agreed upon as to the time of delivery, the vendee is immediately entitled to the possession, and the right of possession and the right of property vests at once in him; but his right of possession is not absolute; it is liable to be defeated *if he becomes insolvent before he obtains possession.*

2. If the seller has despatched the goods to the buyer, and insolvency of the vendee occurs, the seller has the right, by virtue of his original ownership, to stop them *in transitu.* If this be the case, after he has despatched the goods, and while they are *in transitu, a fortiori* is it when he has never parted with them, and when no *transitus* has begun. The right of a vendor to retain possession until payment, is analogous to the right of stoppage *in transitu.* Possession of the vendor is the test of the first; non-possession of the vendee is the test of the last: Bloxham *v.* Sanders, 4 B. & C. 941, 10 E. C. L. R. 479; Bell *v.* Moss, 5 Wh. 189, 204–5; Cabeen *v.* Campbell, 6 Casey 254.

3. By taking notes from the purchaser at four months, and giving a receipt, stating that *when paid* the notes would be in full, the vendor did not destroy his right to retain possession of the sugar on discovering the insolvency of the vendee. The contract of sale did not, of itself, pass the possession, but only the title. The right to possession under the sale, was not an indefeasible one. If, before the goods left the possession of the sellers, the purchasers became insolvent, the latter had no right

[*White et al. v.* Welsh *et al.*]

to take them from the possession of the sellers, without paying or tendering the price.

The use by the defendants of some of the notes in question, as the evidence discloses such use in this case, is not, in law, a transfer of the possession of the goods to the plaintiffs, or a waiver of the defendants' lien thereon, and did not, of itself, authorize the plaintiffs to require or take possession of the goods, without paying therefor, after their insolvency.

Part payment will not defeat the right of retention. Taking notes for the consideration-money and selling some of them without recourse, amounts to nothing more than part payment as between the vendor and vendee, and does not destroy the right of retention by the vendor in case of insolvency of the vendee. It seems now to be settled that the exercise of this right does not operate as a rescission of the contract, but as a remedy to complete its performance: Miles *v.* Gorton, 2 Crompt. & Meeson 504; Bloxham *v.* Morly, Id. 951; Donatts *v.* Broomhead, 7 Barr 301; Newhall *v.* Vargas, 15 Maine R. 314.

4. The delivery of portions of the goods, at different times after the contract of sale, was, of itself, a delivery merely of the particular goods, and did not disturb the possession of the sellers, as to the residue not delivered.

A delivery of a portion of goods included in a contract of sale, is a delivery of the whole, only where the delivery of such portion is intended to be a delivery of the whole, or is in the name or place of the whole.

In cases where delivery of portions of goods sold is made under orders in favour of purchasers of such portions only, or where delivery of portions is made to the buyers or their order, calling only for such portions, no legal presumption arises that the delivery of such portion or portions is a delivery of the whole: Townly *v.* Crump, 4 Ad. & El. 58; Winks *v.* Hassal, 9 B. & C. 372; Tanner *v.* Scovell, 14 M. & W. 28; Bunney *v.* Poyntz, 4 B. & A. 568; Dixon *v.* Yates, 5 B. & A. 313; Mullgate *v.* Keeble, 3 M. & G., 42 E. C. L. R. 61; Hays *v.* Mouille, 2 Harris 48, 53; Buckley *v.* Furnis, 15 Wend. 504; Bailey *v.* Ogden, 3 Johns. 399.

5. Whether from an *express* agreement by the vendors to assume the relation of warehousemen of the vendees in regard to the goods sold, a delivery or acknowledgment of delivery might be inferred, or such change in the relations of the parties as would preclude the vendors from exercising the right of retention, in case of the insolvency of the vendees, are questions that do not arise. There is no evidence of any such express agreement in this case, and no evidence of any agreement in regard to warehousing, which will deprive the defendants of the right of retaining, on the insolvency of the plaintiffs: New *v.*

Swain, 1 Dawson & Lloyd's Merc. Cases, 193; Dixon *v.* Yates, 5 B. & A. 313; Winks *v.* Hassal, 9 B. & C. 372; Bailey *v.* Ogden, 3 Johns. 399.

6. Messrs. Welsh, as consignees of the sugars, selling them for a guarantee commission, without revealing the names of their principals, and after having made large advances to their principals on these sugars, were vested with the character of owners, *quoad* their vendors, so as to have the same right to retain the sugars, in the event of the vendors' insolvency, that they would have had if they had been the absolute owners thereof: Griffiths *v.* Ingleden, 6 S. & R. 429; Feise *v.* Wray, 3 East 93, 6 Id. 371.

7. The assignees for the benefit of creditors stand in no higher equity than the original debtor.

The opinion of the court was delivered, March 11th 1861, by

Lowrie, C. J.—Judges do not ordinarily distinguish between the retainder of goods by a vendor, and their stoppage *in transitu*, on account of the insolvency of the vendee; because these terms refer to the same right, only at different stages of perfection and execution of the contract of sale. If a vendor has a right to stop *in transitu, a fortiori* he has a right of retainer before any transit has commenced.

It is by the equity of the law that this right is allowed, in order to save an unpaid vendor, as late as possible, from an irrevocable completion of the contract on his part, when by the unexpected insolvency of the vendee, a completion on his part has become improbable. The rule is, that so long as the vendor has the actual possession of the goods or as they are in the custody of his agents, and while they are in transit from him to the vendee, he has a right to refuse or countermand the final delivery, if the vendee be in failing circumstances. The authorities cited by defendants' counsel fully sustain this statement of the rule and, we need not discuss them. We find most of them very well summed up also in Bateman on Commercial Law, §§ 253, 266, just published. We may add the case of Winslow *v.* Leonard, 12 Harris 14, wherein some distinctions are pointed out, which set aside as irrelevant most of the authorities that were cited by the plaintiffs' counsel.

No one denies that the evidence admitted, and some of that which was rejected, relating to the terms of sale and acts of ownership and completion of the contract afterwards, were very convincing evidence of such a constructive delivery as made a perfect contract of sale. But, taking the law as we have stated it, all the rejected evidence appears to be entirely unimportant: for the undisputed fact remains, that the goods over which the right of retention was asserted, had not been removed after the

[White *et al. v.* Welsh *et al.*]

sale, but still continued, until the plaintiffs' insolvency, in the stores and custody of the defendants.   This fact itself preserves to the defendants their lien and right of retention for unpaid purchase-money, on the failure of the plaintiffs, where no right of third persons has intervened, as there has not here.   There is nothing like an estoppel of their right of retention.

Much reliance is placed by the plaintiffs on the opinion of Mr. Justice Story, in the case of Barrett *v.* Goddard, 3 Mason 107, decided in the Circuit Court in 1822.   But we are constrained to say that that opinion exhibits a great confusion of principles and an entire misapprehension of many of the cases cited in support of it, and that we cannot regard it as a true declaration of the law of the case.   The question was of the right of retainer or stoppage *in transitu;* and yet some of the cases cited relate only to the question of the validity of the contract under the Statute of Frauds (1 Taunt. 458; 3 B. & A. 321; 1 Camp. 513; 1 Pick. 476), and some to the question of the completeness of the contract, so as to pass the title to the risk (11 East 211; 6 Id. 214; 4 Taunt. 644; 5 Id. 176; 2 M. & S. 397; 10 Mass. 308).   Some of them do relate to the rights of retainer and stoppage, and decide that the right is gone where the goods are in the hands of a third person, and the vendee has obtained the control of them by a delivery order: 12 East 614; 4 B. & P. 69; 7 Taunt. 278; 4 Camp. 251.   Or where the vendor has assented to a sale by the vendee to a third person: 14 East 308; 1 Starkie 447; 2 Caines 38.   The only other one relates to the termination of the transit.   Not one of the cases supports the judgment given by the learned judge.   These questions are all distinguished in Winslow *v.* Leonard, 12 Harris 14; and thus we may be saved from such confusion hereafter.

Judgment affirmed.